```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X
```
MICHAEL J. KEARINS, as successor in
interest to PINNACLE INTERIOR
ELEMENTS, LTD.,

                              Plaintiff,

        -against-

PANALPINA, INC.,

                              Defendant.
```
------------------------------------------------------X
```

**MEMORANDUM & ORDER**

10-CV-01198 (RER)

**RAMON E. REYES, JR., U.S.M.J.:**

## INTRODUCTION

Before the court is Panalpina Inc.'s ("Defendant") motion for judgment as a matter of law[1] on Michael J. Kearins' ("Plaintiff") fraudulent inducement claim. Defendant's motion was made at the close of Plaintiff's case-in-chief in a jury trial. Plaintiff called four fact witnesses and offered documentary evidence before resting his case. After considering the evidence adduced at trial and the parties' respective arguments, I granted Defendant's motion for a judgment as a matter of law on the record, and indicated that a written decision would issue shortly thereafter. This is that decision.

---

[1] Although Defendant's counsel moved for a "directed verdict" (7/17/2013 Tr. at 517:12-14), the Court interprets his application as a motion for judgment as a matter of law under Fed. R. Civ. P. 50(a). *See S.E.C. v. Razmilovic*, No. 12-CV-0357, 2013 WL 3779339, at *13 (2d Cir. Jul. 22, 2013) (explaining that a motion for a directed verdict has been "known since 1991 as a 'judgment as a matter of law'" pursuant to Rule 50).

# BACKGROUND

### I. History of the Case

A more thorough recitation of the facts is contained in the July 15, 2010 supplemental opinion. (*See* Dkt. No. 57 ("Supp. Op.") at 2-6.) The Court assumes familiarity with the underlying facts and repeats only those facts relevant to the instant motion.

Plaintiff, as successor in interest to Pinnacle Interior Elements, Ltd. ("Pinnacle"), brought this action against Defendant asserting claims for breach of fiduciary duty (count I), fraudulent inducement (count II), negligent misrepresentation (count III), and negligence/gross negligence (count IV) on March 16, 2010. (Dkt. Nos. 1, 2.) On August 15, 2011, the parties cross-moved for summary judgment. (Dkt. Nos. 49, 52.) The Court granted Defendant's motion for summary judgment in part and set a trial date for the parties' two remaining claims. (Dkt. Nos. 56, 57.) Before trial, Defendant withdrew its counterclaim against Plaintiff. (Dkt.No. 86.)

A jury trial on Plaintiff's fraudulent inducement claim commenced on July 15, 2013. Plaintiff called four fact witnesses before resting. (Dkt. Entry dated 7/15/2013.) Plaintiff and Brenda Cashion ("Cashion") testified to conversations with Defendant's employees prior to entering into a customs brokerage and freight forwarding relationship. (Dkt. Entry dated 7/15/2013; Dkt. Entry Dated 7/16/2013.) Greg Huntsinger ("Huntsinger") and Lonnie Williford's ("Williford") testimony concerning Defendant's customs policies and practices was offered to the jury by deposition transcript. (Dkt. Entry dated 7/15/2013; Dkt. Entry Dated 7/16/2013.)

## II. The Evidence at Trial

### A. Pinnacle's Communications with Defendant Prior to Entering into a Customs Brokerage and Freight Forwarding Relationship

In early 2003 Pinnacle encountered a "major problem" with Kuehne & Nagel, its logistics provider at the time. (7/15/2013 Tr. at 36:7-11.) According to Plaintiff, Keuhne & Nagel released a forty-foot flooring container without Pinnacle's knowledge. (*Id*. at 36:7-37:17.) As a result of Keuhne & Nagel's error, Pinnacle began searching for a replacement logistics company, one that could handle both freight forwarding and customs brokerage. (*Id*. at 37:21-23.) Pinnacle received phone calls from several logistics providers offering their services. (*Id*. at 37:24-38:5.)

Once such sales call was from former Kuehne & Nagle employee Kip Broussard ("Broussard"). (*Id*. at 38:7-8; 7/16/2013 Tr. at 207:21-208:2.) Broussard, who worked for Defendant at the time, contacted Cashion and suggested that Pinnacle meet with his new employer. (7/15/2013 Tr. at 38:6-11.) Cashion testified to the following telephone communications with Broussard:

> QUESTION: During those telephone calls, what did Kip tell you when he first contacted you?
>
> CASHION: That he had left Kuehne & Nagel and gone to work for a more -- you know, a better and improved freight forwarder, and that he would like us to consider giving them the opportunity to service our needs.
>
> QUESTION: Did he tell you anything else at that time?
>
> CASHION: I don't recall.
>
> QUESTION: What did you tell him when Kip Broussard discussed with you the fact that he moved to a new and improved customs

3

> broker?
>
> CASHION: I'm not certain if he was aware of the challenges that we had with that single transaction with Kuehne & Nagel or not. But I probably shared with him that that had been an issue for Mike and that we were looking to change and said his timing was probably perfect.
>
> QUESTION: Were there any other items that were discussed between you and Kip Broussard over telephone calls?
>
> CASHION: Again, the details of the phone calls I can't remember at this time.

(7/16/2013 Tr. at 209:7-14, 209:19-210:5.) Cashion testified that she did not recall any other telephone communications with Defendant's employees prior to the parties' two sales meetings. (*Id.* at 209:15-18.)

In approximately March or April 2003, Pinnacle and Defendant met at Pinnacle's office. (7/15/2013 Tr. at 38:20-23.) Pinnacle was represented by Cashion; Defendant was represented by Broussard and vice president of sales Ken Bagley ("Bagley"). (7/15/2013 Tr. at 39:6-10.) It is unclear whether Plaintiff attended the first meeting. (7/15/2013 Tr. at 38:16-19; 7/16/2013 Tr. at 211:7-9.) The attendees exchanged "folksy" niceties before turning to Pinnacle's freight forwarding and customs needs. (7/16/2013 Tr. at 210:22-211:4.)

Cashion testified to the following discussions at the first meeting:

> QUESTION: Okay. Now, you testified that you discussed your needs with respect to freight forwarding and customs broker, correct?
>
> CASHION: Yes.
>
> QUESTION: So both issues were discussed in the meeting?
>
> CASHION: Correct.

4

QUESTION: What is it that you communicated to Panalpina about what your needs were with respect to freight forwarding and customs brokerage?

CASHION: Quite often freight forwarding and customs brokerage are not done by the same firm. Sometimes we need to do in-house brokerage, so deal directly with the steamship lines. Freight forwarder kind of handles the relationship with the steamship lines and the broker handles all of the business with customs and all of the documentation associated it. We needed and wanted a firm that could do all of that for us because we didn't understand that business. We really didn't want to understand that business. We needed somebody who could do that for us. And so we made it very clear up front that we were a small company, we didn't have the personnel to learn and do all of the activities that they did. We needed somebody to hold our hand and kind of direct us because we didn't -- we didn't know the intricacies of U.S. Customs and customs law. And so we made it very clear to anybody that we talked to about engaging in a relationship that we were kind of infants that needed hand holding and help getting us through that process, and we needed somebody that we could have daily interaction with.

QUESTION: Was that meeting before the power of attorney was ultimately signed between you and Panalpina?

CASHION: Yes.

QUESTION: What did Ken and Kip Broussard and Ken Bagley tell you when you raised all of these issues with them about needing hand holding and your other -- your desire to have somebody to make sure that your customs work and duties were going well?

CASHION: They assured us that they had the expertise and personnel that could handle that for us. And that we would have a specific person assigned to our account that we could contact on a regular basis to answer any of our questions, to process all of the documentation and to help us be able to track our shipments on a regular basis.

(7/16/2013 Tr. at 211:10-212:13; )

Approximately one to two weeks later, the parties reconvened for a second meeting at Pinnacle's office. (7/16/2014 Tr. at 213:2-11.) Plaintiff and Cashion represented Pinnacle; Bagley represented Defendant. (7/16/2014 Tr. at 213:4-6.) The parties continued to discuss Pinnacle's freight forwarding and customs needs. (7/16/2014 Tr. at 213:14-17.)

Cashion testified to the following exchanges:

> QUESTION: At that meeting, did you discuss the same issues and concerns that you had raised in the first meeting with them?
>
> CASHION: Yes. Mike would have reiterated everything that I had stipulated.
>
> QUESTION: Do you recall that that's the case, that he reiterated what you said?
>
> ANSWER: We did that on a regular basis. We reiterated over and over again that we needed hand holding because we didn't have the knowledge.
>
> QUESTION: Okay. What did Ken Bagley tell you in response to your request for assurances from them?
>
> CASHION: Again, we were reassured that they had the personnel and the expertise to handle anything that came up for us.
>
> QUESTION: What was your reaction when you learned from Panalpina that they were in a position to provide you with the assurances that you needed?
>
> CASHION: Well, they came with a recommendation of somebody that we had worked with. So we had every confidence based on Kip Broussard and Ken Bagley's assurances that it would be kind of a seamless transition from one forwarder to the next. We had had no issues with Kuehne and Nagel other than taking on a shipment we didn't authorize. So we had no reason to believe that the relationship with Panalpina would be anything less than that.

6

QUESTION: Prior to the date that the power of attorney was signed, did you provide a copy of the binding ruling that you'd received on Manchurian Maple to Panalpina?

CASHION: I'm not sure of the date that we provided that, but it would have been provided to them.

QUESTION: Okay. Was it on or around the early part of 2003?

CASHION: Yes.

QUESTION: What did Panalpina tell you when you provided the binding ruling to them?

CASHION: I don't recall.

QUESTION: Did they tell you that they would use it?

CASHION: I don't recall that they said one way or another that they would or wouldn't.

. . .

QUESTION: Were the promises that Panalpina had made to you, were they important to Pinnacle?

CASHION: They were critical to us.

QUESTION: Why is that?

CASHION: Because we didn't have the knowledge. I mean, I knew some terminology in the import/export world. I knew that we needed door-to-door rates. I knew that we wanted them all in. And I knew what a Harmonized Tariff code was. At the time we started our business and until I became a customs broker, I didn't realize how critical the Harmonized Tariff Code was. And I didn't realize, until we began having trouble with customs, how legal it all was.

(7/16/2014 Tr. at 213:14-214:25; 216:5-16.)

Plaintiff testified to the discussions at the meetings described above. Plaintiff offered his recollection of the following conversations between Pinnacle and Defendant's employees at the first meeting:

> QUESTION: What was discussed at the [first] meeting?
>
> PLAINTIFF: Well, the first meeting . . . we talked a little bit about the history of Panalpina. They were, as they showed us, told their story to us, one of the world's largest in those businesses. They were dominant in the business, extremely experienced, over a hundred years plus in the industry and assured us that they could solve the problems. In particular, Ken indicated to us that Kip had briefed him on the difficulties we had experienced at Kuehne & Nagel and we were very concerned about and so time was spent discussing that, why we were concerned about that, what the issues were. And Ken's assurance to us was that because of their length and breath in the industry and their expertise, those types of things wouldn't happen and that they could control that.
>
> QUESTION: Did you discuss at all Pinnacle's knowledge of importing?
>
> PLAINTIFF: It came up in our discussion obviously because as they put it to us, Panalpina deals with the biggest of big importers. And I can't say for sure whether they said Walmart or Sam's or Lowe's or Home Depot type of people but really big importers on down to, as they said, we also worked with moms and pops. And we were really on the version of mom and pop in this type of situation. So we said we don't have any experience, there is no one in the company who has dealt with this, so we need someone to take care of it 100 percent. And they said that's not a problem, that's what we do every day.
>
> . . .
>
> PLAINTIFF: Specifically, they addressed the issue of managing the control of information, managing the situation similar to what we experienced in Kuehne & Nagel and how that could never happen. They talked about how they interfaced so effectively with Customs. We found that not to be true. We found that they -- subsequent to that, we found that they admitted that they on a regular basis submitted false information to Customs.

8

> . . .
>
> QUESTION: I want to take you back to their statement then we'll go into what you discovered subsequently. So regarding the services that they promised to provide, is there anything else that Panalpina promised you?
>
> PLAINTIFF: Panalpina, I guess -- Panalpina promised us that they could pick up our material, wherever it was located throughout the world, whether it be in China, anywhere in Southeast Asia, anywhere, solve all the problems in getting it from that point to our door, keep us in compliance with the exporting laws, the importing laws, freight forwarders, it would arrive on time without any problems, with no complications and that was inaccurate.
>
> QUESTION: Who said that? Was it Kip Broussard or Ken Bagley?
>
> PLAINTIFF: Ken Bagley specifically. Once Kip introduced Ken Bagley, Ken took over the meeting as VP of sales because Kip was the new guy.
>
> QUESTION: Did you understand the statement by Ken to be a statement of fact or opinion?
>
> . . .
>
> PLAINTIFF: To me, it was clearly a statement of fact. Not only did he say it to me but their brochure reinforced what he said. As VP, he was an officer of the company, so that sort of had weight for me, that he is not going to misrepresent his company to do those things, so I took it as fact.

(7/15/2013 Tr. at 39:11-40:13; 41:1-4; 41:12-42:4; 42:7-11.)

Plaintiff also testified as to the following discussions at the second meeting between Pinnacle and Defendant's employees:

> QUESTION: Did Ken Bagley tell you anything at [the second] meeting?

9

PLAINTIFF: He reconfirmed everything he had told me in the first meeting about their services and went on to say that after learning more about us, he actually said yes, they could provide all the services we need, reiterated their experience in the industry as having been in it for over a hundred years and that they had a problem free track record and solved the problems and took care of it where we would

not have a compliance issue with either export out of China or import into the United States.

QUESTION: Did he bring in a Customs compliance expert on the sales call at all?

PLAINTIFF: No.

QUESTION: So you did not talk to Mr. Huntsinger at this meeting at all?

PLAINTIFF: No.

. . .

QUESTION: Did Mr. Bagley make any other statements at this meeting?

PLAINTIFF: Not specific that I can remember other than just reinforcing that they could do all, provide all the services we needed.

QUESTION: So just what you told you us. Did they stay anything specifically about Customs compliance?

PLAINTIFF: Again, it was that their hundred years experience in having dealt with Customs to where there was not a situation they hadn't faced before and they would keep us in compliance, out of trouble and manage the process without fault.

QUESTION: Did you relate to them anything about your experience in the Customs industry?

PLAINTIFF: We related the issue with the one product, the wood flooring product that we were importing with Kuehne & Nagel and the binding ruling that the government -- that Kuehne & Nagel had recommended we submit for with the Customs department where

they said that this is the proper ruling to be used for importing this product and that we should always use that when we import the product.

QUESTION: Did you relate anything about your level of expertise with Customs?

PLAINTIFF: We told them, we discussed that we had no expertise, that we knew how to help manufacturers make the product we needed, we knew how to market it, sell it, we knew how to handle customer relationship but we knew nothing about the importing of product into this country.

QUESTION: So did you tell them what your needs were?

PLAINTIFF: In depth.

QUESTION: What did you say to them?

PLAINTIFF: We detailed all the services we needed. We detailed all the services that we needed on the inbound freight, the inbound duties handling, export issues with whatever country it was going to come from, and they pointed out they had over 80 offices throughout the world so they had that kind of experience. So we thought comfortable that they would be able to handle the job for us.

QUESTION: You said told them what you needed. What did you need specifically with the inbound freight, with customs and the other areas you described?

PLAINTIFF: We needed to be assured that we would be in compliance with all Customs rules and regulations. We needed to have timely delivery of the product as guided by them, as expected. We needed to have detailed recordkeeping, proper -- we had to have the best cost possible, et cetera.

QUESTION: And what did they say to you?

PLAINTIFF: They told us, they assured us that they could do it, that they had the systems within their company to do it, they had the relationships to do it and they were experts at it.

(7/15/2013 Tr. at 44:23-45:12; 45:21-47:20.) In addition, Plaintiff testified that at the initial meeting "[Defendant] told us that they were interfaced perfectly with customs and could always be on top of everything." (7/15/2013 Tr. at 101:10-11.)

      B.      <u>The Customs Brokerage and Freight Forwarding Relationship Between Pinnacle and Defendant</u>

After the meetings between the parties, Pinnacle retained Defendant as its customs broker and freight forwarder and Plaintiff signed a power of attorney and credit agreement on behalf of Pinnacle on May 20, 2003. (Pl.'s Exh. 45, 46; 7/15/2013 Tr. at 51:8-22)

During the parties' relationship, United States Customs and Border Protection ("CBP") placed Pinnacle on the sanctioned importers list due to misclassifications in duty entries and delays in responding to CBP's requests for information and notices of action. (7/15/2013 Tr. at 93:21-95:9.) As a result, Pinnacle had to pay estimated duties at the time of entry instead of receiving the benefit of a ten-day post-entry payment period. (7/15/2013 Tr. at 93:24-94:9) Pinnacle remained on the sanctioned importers list until May 2008. (7/15/2013 Tr. at 96:24-97:1.) Pinnacle terminated its relationship with Defendant later in 2008. (7/15/2013 Tr. at 126:11-12.) With the exception of customs-related issues, Defendant dispatched its freight forwarding duties without incident. (7/15/2013 Tr. at 130:23-25.)

### III. <u>Defendant's Motion for Judgment as a Matter of Law</u>

Based on the undisputed testimony and documentary evidence admitted at trial, Defendant's counsel moved that judgment be entered for Defendant on Plaintiff's fraudulent inducement claim pursuant to Rule 50(a) of the Federal Rules of Civil Procedure. Specifically, Defendant argued that neither Plaintiff nor Cashion testified that either Bagley or Broussard

made any misrepresentations of material fact regarding the Defendant's services. At best, Defendant averred, Plaintiff offered some evidence that Defendant made mistakes during the course of the parties' logistics relationship. Accordingly, in the absence of clear and convincing evidence of any misrepresentations of material facts, Defendant contends that a reasonable jury could not conclude that it fraudulently induced Plaintiff to enter into a business relationship.

## DISCUSSION

**I.     Judgment as a Matter of Law Under Rule 50(a)**

Motions for judgment as a matter of law in a jury trial are analyzed pursuant to Rule 50(a) of the Federal Rules of Civil Procedure ("Rule 50"), which provides as follows:

> (1) If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:
>
> (A) resolve the issue against the party; and
>
> (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed.R.Civ.P. 50(a)(1); *See also Highland Capital Mgmt. LP v. Schneider*, 607 F.3d 322, 326 (2d Cir. 2010).

Rule 50 "imposes a heavy burden on a movant, who will be awarded judgment as a matter of law only when 'a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'" *Cash v. Cnty. of Erie*, 654 F.3d 324, 333 (2d Cir.2011) (quoting Fed.R.Civ.P. 50(a)(1)); *accord Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119,

127-28 (2d Cir. 2012). In deciding a Rule 50 motion, the court "must draw all reasonable inferences in favor of the nonmoving party" and "disregard all evidence favorable to the moving party that the jury is not required to believe." *Adedeji v. Hoder*, No. 09-CV-4046 (CBA) (MDG), 2013 WL 1233501, at *5 (E.D.N.Y. Mar. 27, 2013) (citations and quotations omitted); *see also Higgins v. Consolidated Rail Corp.*, 451 F. App'x 25, 26 (2d Cir. 2011).

"A court may not grant judgment as a matter of law under unless (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it]." *Leach v. Kaykov*, No. 07-CV-4060 (KAM) (VVP), 2013 WL 214383, at *3 (E.D.N.Y. Jan. 20, 2013) (internal quotations omitted) (citing *Learning Annex Holdings, LLC v. Rich Global*, LLC, 860 F.Supp.2d 237, 240 (S.D.N.Y. 2012)).

In short, judgment as a matter of law under Rule 50(a) is appropriate when "drawing all reasonable inferences regarding the weight of the evidence and the credibility of witnesses in favor of [the nonmovant], a reasonable jury could only have found for the [movant]." *In re Joint E. & S. Dist. Asbestos Litig.*, 52 F.3d 1124, 1131 (2d Cir.1995).

## II. Fraudulent Inducement

To prove fraudulent inducement under New York law, a plaintiff must show by clear and convincing evidence "(1) a representation of material fact, (2) which was untrue, (3) which was known to be untrue or made with reckless disregard for the truth, (4) which was offered to deceive another or induce him to act, and (5) which that other party relied on to its injury." *Aetna*

14

*Cas. & Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 580 (2d Cir. 2005); *see also Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006).

Further, "[u]nder New York law, to sustain a claim for fraud a party must: '(i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages.'" *Mosallem v. Matrix Intern. Logistics, Inc.*, No. 03-CV-7626 (LLS), 2004 WL 97690, at *2 (S.D.N.Y. Jan. 20, 2004) (quoting *Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.*, 98 F.3d 13, 20 (2d. Cir. 1996) (internal citations omitted); *see also Atlantis Info. Tech., GmbH v. CA, Inc.*, 485 F. Supp. 2d 224 (E.D.N.Y. 2007).

"[A]s a general matter, a fraud claim may not be used as a means of restating what is, in substance, a claim for breach of contract." *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 416 (2d Cir.2006) (citations omitted). "New York distinguishes between a promissory statement of what will be done in the future that gives rise only to a breach of contract cause of action and a misrepresentation of a present fact that gives rise to a separate cause of action for fraudulent inducement." *Fierro v. Gallucci*, No. 06-CV-5189 (JFB)(WDW), 2008 WL 2039545, at *4 (E.D.N.Y. May 12, 2008); *see also WIT Holding Corp. v. Klein*, 282 A.D.2d 527, 528 (N.Y. App. Div. 2001) ("[A] misrepresentation of material fact, which is collateral to the contract and serves as an inducement for the contract, is sufficient to sustain a cause of action alleging fraud.")

To support his fraud claim, Plaintiff offered evidence that Defendant made the following statements to induce Pinnacle into entering a business relationship: (a) Defendant had extensive industry experience and appropriate staffing to ensure Pinnacle's logistics needs would be met;

15

(b) Defendant would get Pinnacle's product from door-to-door in a timely fashion with no problems or complications; and (c) Defendant was "perfectly integrated" and "seamlessly interfaced" with U.S. Customs and Border Patrol and that it "could always be on top of everything."

First, Bagley's statements regarding Defendant's industry experience and staffing are not material misrepresentations sufficient to support a finding that Defendant fraudulently induced Plaintiff. *See John Paul Mitchell Sys. v. Quality King Distribs., Inc.*, No. 99-CV-9905, 2001 WL 910405, at *4 (S.D.N.Y. Aug. 13, 2001) ("[P]romises serving as inducement for the execution of the contract, such as representations of expertise and resources, are not considered collateral to the contract because they 'simply underscore the defendant's purported intention and ability to perform the contract' and are thus 'simply part and parcel of the intention to perform.'") (quoting *Crabtree v. Tristar Auto. Group, Inc.*, 776 F.Supp. 155, 162–63 (S.D.N.Y.1991)); *see also Mosallem v. Matrix Int'l* Logistics, Inc., 03-CV-7626 (LLS), 2004 WL 97690, at *2 (S.D.N.Y. Jan. 20, 2004) ("[T]he claim of fraud is that defendant misrepresented that it was expert in international shipping and customs matters . . . [which] merges into the claim of breach of contract, and adds nothing to it.") In addition, Plaintiff and Cashion did not testify that Defendant was improperly staffed or that it lacked licensed custom brokers.

Second, Defendant's promises to effectively transport Pinnacle's product and to keep Pinnacle in compliance with CBP are statements regarding the future performance of the contract between the parties. "'[T]he failure to fulfill a promise to perform future acts,' (or statements of future intent) can [only] support a fraud action . . . [if] 'there existed intent not to perform *at the time the promise was made.*'" *Soley v. Wasserman*, 823 F. Supp. 2d 221, 235 (S.D.N.Y.2011)

16

(quoting *Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir. 1994)); *see also LaRoss Partners, LLC v. Contact 911 Inc.*, 874 F. Supp. 2d 147, 163-64 (E.D.N.Y. 2012); *DNJ Logistic Group, Inc. v. DHL Exp. (USA), Inc.*, 727 F.Supp.2d 160, 169 (E.D.N.Y. 2010). Here, Plaintiff cannot convince a reasonable jury that Defendant lacked the intent to perform its freight forwarding and customs brokerage duties. To the contrary, Plaintiff testified that throughout their relationship Defendant performed its duty to transport Pinnacle's flooring products from China to the United States. Moreover, the problems Pinnacle encountered with its previous freight forwarder, issues that led to Pinnacle's retention of Defendant, never resurfaced. Finally, as to Defendant's intent to perform its customs responsibilities, Plaintiff does not dispute that Defendant employed licensed customs brokers or that it used standard customs interface programs.[2]

Third, and finally, Defendant's representations regarding its ability to interface with CBP were not shown to be untrue because Defendant used and possessed such systems. Indeed, Huntsinger testified that Defendant's employees operated several CBP interface systems, the Automatic Brokerage Interface ("ABI"), The Automated Invoice Interface ("AII"), and the Automated Customs Interface ("ACI"). (7/16/203 Tr. at 362:17-364:13.) Plaintiff did not rebut this testimony. These interface systems allowed Defendant to electronically communicate with CBP, as Defendant promised at its meetings with Pinnacle. Moreover, Defendant possessed the requisite technological capacity to review rejected customs entries through ABI and AII. That Defendant's employees failed to follow up on ABI and AII rejection notations, or that Defendant

---

[2] In addition, Plaintiff's argument that Defendant's employees had a practice and policy of submitting knowingly false information is without merit. Instead of testifying to a policy of deceiving customs, Huntsinger explained that if he disagreed with a customer's classification he would share his objection but defer to the customer's final classification decision when filing customs information on the customer's behalf. (7/16/2013 Tr. at 402:18-403:3.)

did not have an automated rejection detection system, does not amount to clear and convincing evidence that Bagley misrepresented Defendant's ability to interface with CBP.

If anything, this failure to follow up on rejected entries indicates that Defendant's employees were negligent in operating the ABI and AII systems. Such a failure to "stay on top" of customs feedback is a failure to perform under the contract, and as discussed above such a failure does not give rise to a fraudulent inducement claim. To prove that Bagley's statements regarding customs interface and integration were untrue, Plaintiff would need to offer evidence that Defendant did not possess or use adequate customs interface systems. No such testimony was offered.

In all, none of the proffered fraudulent misrepresentations were collateral or extraneous to the parties' contract, and therefore, cannot sustain a fraudulent inducement claim. Accordingly, after considering all of Defendant's pre-contract statements, I conclude that a reasonable jury could not find by clear and convincing evidence that Bagley or Broussard misrepresented any material fact to Plaintiff. Since Plaintiff cannot establish an essential element of his fraudulent inducement claim, I must grant Defendant's motion for judgment as a matter of law.

## CONCLUSION

Based on the foregoing, Defendant's motion for judgment as a matter of law on Plaintiff's fraudulent inducement claim is granted. Defendant's counterclaim is dismissed without prejudice. The case is now closed and judgment will be entered accordingly.

**SO ORDERED.**

**Dated: August 28, 2013**
      **Brooklyn, New York**

*Ramon E. Reyes, Jr.*
**Ramon E. Reyes, Jr.**
**United States Magistrate Judge**